**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Case No. 4:25-cr-00007** |
| | ) | |
| CHRISTIN MARIE CURTRIGHT, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Christin Curtright, by counsel, respectfully asks this Court to vary downward from the advisory guidelines range and impose the statutory mandatory minimum term of imprisonment of 180 months. That sentence, fifteen years in federal prison, is sufficient, but not greater than necessary, to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a).

## INTRODUCTION

Christin Curtright stands before the Court convicted of a grave offense that harmed a 13-year-old child. She does not seek to minimize that harm. She does not ask the Court to excuse her conduct because of the trauma inflicted on her in childhood, or because of the pressure and control exerted by her co-defendant husband. The victim in this case deserved protection. She deserved adults who would put her safety first. Christin did not do that. She recognizes that a substantial sentence is warranted.

But sentencing requires more than consideration of the offense conduct alone. It requires an individualized judgment about the person before the Court: her history, her role, her culpability, and the sentence necessary—but not greater than necessary—to satisfy the

purposes of 18 U.S.C. § 3553(a). The record establishes that Christin was not the driving force behind this offense. It shows, instead, a woman profoundly shaped by trauma—childhood abandonment and abuse that left her especially vulnerable to control, dependency, and fear of abandonment. Her co-defendant husband exploited that vulnerability.

Christin was abandoned by both of her parents when she was a child and left on the doorstep of her aunt's house, covered in bruises. The people who were supposed to protect her left her. The people who were supposed to teach her safety, boundaries, and love instead taught her that attachment was fragile, that survival depended on appeasing others, and that abandonment was always one wrong move away. She endured sexual and emotional abuse that compounded those injuries. By the time she reached adulthood, she carried the symptoms of                —most notably, emotional dependency and a desperate need not to be discarded again.

Her husband, Justin Curtright, became the center of that damaged emotional world. He was not simply a spouse. To Christin, he was security, belonging, family, and survival. He and their young son were her whole world. She feared losing him with the same terror rooted in the abandonment of her childhood. That fear does not excuse her choices, but it helps explain how she came to make them. When he pushed, she yielded. When he directed, she complied. When he normalized the unthinkable, she followed. She did so not because she was free from responsibility, but because her capacity to resist him was profoundly compromised by the trauma that shaped her life.

The law does not require the Court to ignore that reality. Section 3553(a) directs the Court to consider not only the nature and circumstances of the offense, but also the history

and characteristics of the defendant. Here, those factors matter. Christin's role in the offense cannot be fairly assessed without understanding the controlling and dependent relationship in which it occurred. Her culpability is real, but it is not the same as the person who dominated, directed, and exploited her. Her conduct demands punishment, but punishment must still be proportionate to her individual responsibility.

A sentence of 180 months is not a modest sentence. It would account for the gravity of the offense, promote respect for the law, provide just punishment, deter future criminal conduct, and protect the public. It would also recognize what the record shows: that Christin is a woman whose                    and trauma-rooted fear of abandonment made her susceptible to the control of the person she believed she could not live without.

The Court can hold Christin accountable without treating her as the driving force behind this offense. It can condemn the harm done to the minor victim while still recognizing that Christin's own childhood left her vulnerable to manipulation, dependency, and control. For those reasons, and for the reasons set forth below, a downward variance to 180 months' imprisonment is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

## LEGAL FRAMEWORK

Federal sentencing is an individualized inquiry governed by the parsimony principle. Section 3553(a) requires the Court to impose a sentence "sufficient but not greater than necessary" to accomplish the goals of sentencing. In determining the particular sentence to be imposed, the court must consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). That

3

inquiry is not collective. "There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her 'as an individual.'" *Concepcion v. United States*, 597 U.S. 481, 486 (2022) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). Consistent with that tradition, each case requires "a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon*, 518 U.S. at 113).

The Fourth Circuit has enforced that principle as a procedural requirement. A sentencing court must make an individualized assessment based on the facts presented and must apply the § 3553(a) factors to the defendant before it. *United States v. Carter*, 564 F.3d 325, 328-30 (4th Cir. 2009). It is not enough to recite the statutory factors in general terms. The Court must connect those factors to the defendant's own conduct, history, characteristics, culpability, mitigation, and risk. *See id.* at 329-30. Where a defendant presents nonfrivolous reasons for a different sentence, the Court should address those arguments and explain its reasons for accepting or rejecting them. *See id.* at 328.

That requirement is particularly important in a multi-defendant case. By its terms, § 3553(a)(6) concerns "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." But it does not require similar sentences for defendants who are materially different. Nor does it permit one defendant to be sentenced as an extension of another. The Court must determine the sentence that is sufficient, but not greater than necessary, for *this* defendant.

The advisory guidelines remain important, but they do not displace the Court's duty to conduct an individualized statutory analysis. The guidelines are the "starting point and the initial benchmark," but not the only consideration. *Gall*, 552 U.S. at 49. The Court must calculate the advisory range correctly and consider it carefully. *Id.* But the guidelines are only one part of the broader § 3553(a) framework. *Kimbrough v. United States*, 552 U.S. 85, 101, 111 (2007). The Court's ultimate obligation is to fashion a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Because the requested sentence in this case is the statutory mandatory minimum, the question is whether any additional term of imprisonment is necessary to satisfy § 3553(a).

## ARGUMENT

A sentence of 180 months is a severe punishment, and it is sufficient. It is the sentence that best fits this defendant, this offense, and this record. The advisory guideline range reflects the seriousness of the offense, but it does not account for Christin Curtright's subordinate role, the trauma-rooted dependency that made her vulnerable to Justin Curtright's pressure and control, her low assessed risk of recidivism, and her minimal criminal history. Each of those facts bears directly on the statutory purposes of sentencing. Together, they support a downward variance to 180 months.

**A. The nature and circumstances of the offense, considered with Christin Curtright's history and characteristics, support a sentence of 180 months.**

Section 3553(a)(1) requires the Court to consider the offense conduct and Christin Curtright's history together. Those considerations are inseparable here. The offense was serious. It caused harm to a child, and Christin bears responsibility for her role in that harm.

But § 3553(a)(1) also requires the Court to consider how this defendant came to commit this offense. The record shows that Christin's conduct occurred within a dependent and controlling marital relationship that exploited vulnerabilities rooted in a childhood history "fraught with abandonment, neglect, and physical and sexual abuse." Def.'s **Exhibit 1**, at 15. Those experiences did not merely form part of Christin's background; they shaped how she attached to others, how she understood security and abandonment, and how she responded to pressure from Justin Curtright, the person on whom she had become emotionally dependent. *See generally* Def.'s **Exhibit 1**.

Christin was evaluated by clinical psychologist Michael L. Hendricks, Ph.D., who diagnosed her with

*Id.* at 15, 16. In his evaluation report, Dr. Hendricks explains that "                    typically arises out of early childhood experiences of abuse or neglect that interfere with a clear identification with an important caregiver—an identification that contributes to formation of both basic trust and personal identity." *Id.* This history made her particularly "susceptible to further psychological harm caused by additional traumatic experiences—especially those that involve a violation of trust," such as the emotional neglect she experienced in both of her marriages, which "exacerbated an already existing                    ." *Id.* The effect was an erosion of her sense of self and her ability to assert her own needs, leaving her "repeatedly

bending to the needs of others in the hope of gaining or earning their approval and care—and

keeping it." *Id.* at 14.

Psychological testing revealed clinically significant findings on scales

*Id.* at 9.

Notably, Christin's testing scores also fell within the problematic range on the

*Id.* at 10.

The other three scores that fell within the problematic range were associated with

*Id.* at 10. People with elevated      scores "often greatly fear

abandonment and rejection in relationships." *Id.* Each of these elevated scores contributed to

Ms. Curtright's elevation on the                          , which "typically leads to ambivalent,

insecure and often problematic interactions with others, a tendency to rely on other people

for information about oneself, and a greater susceptibility to influence by others." *Id.*

7

Considering this history of psychological problems "firmly rooted in her history of trauma experiences," it is not surprising that Christin Curtright gave into her husband's desires to bring a minor girl into their relationship; "she was willing to do anything to make him happy and to make their relationship work," a "solid testament to her greatest fear: abandonment." *Id.* at 7, 13.

That fear appears to have been justified. The Discord chat messages offered by the government demonstrate that Justin dangled his list of "internet girlfriends" in Christin's face and frequently stepped outside and away from Christin to talk on the phone to them. Gov't Ex. 9-12. This was a consistent theme in their marriage. When Christin first met Justin, he was still in an "on-off relationship with his ex," even after Christin had moved in with him. Months later, when Christin became pregnant with Justin's child, Justin "insisted on opening their relationship" and added a third person, Brittany. Def. **Exhibit** 1, at 4. Brittany, however, "wanted more out of the relationship than Ms. Curtright was able to give," and left. *Id.*

In the Discord chat, Christin expressed discomfort with Justin having girlfriends "on the side," telling him he made her feel "like an outsider." Gov't Ex. 10, 11. She wanted to be part of whatever he was doing, even if it would hurt her to know what he was talking about with these other girls; indeed, it hurt more for her *not* to be a part of it. Gov't Ex. 11. She reminded her husband about her "really bad abandonment issues." Gov't Ex. 37. Justin showed no mercy. He told her, "[y]ou know how I am, if I was truly in love with one, the others get cut off," and further explained that he was "indulging a personal fantasy of fucking a teenage runaway." Gov't Ex. 11, 12.

8

Later in the chat, Justin told the minor victim (M.V.) that

. Gov't Ex. 13. In response,

Christin had "asked if [he] was leaving," and when Justin said no, "[s]he said that everything

is ok, **she just needed to hear [him] say [it] and know that [he] won't leave her**." *Id.*

(emphasis added). Justin went on to complain to M.V. that he is "shackled to an ugly woman

that stinks with a screaming bitch of a toddler I can't stand." Gov't Ex. 28. He asked M.V.

Gov't Ex. 15, 24.

Gov't Ex. 24. Justin kept these conversations with M.V. secret from Christin. He recognized

it would "break her." *Id.*

This context does not excuse Christin's conduct. But it does bear directly on culpability.

Her choices were wrongful, but they were made in the context of a psychological condition

and relationship dynamic that materially compromised her ability to resist Justin's pressure. A

9

sentence of 180 months accounts for the seriousness of the offense while recognizing the mitigating force of Christin's history and characteristics.

### B. Christin Curtright should not be punished as an extension of her co-defendant.

The government's memorandum repeatedly frames the offense as conduct by "the Curtrights." *See generally* Gov't Sent. Mem., ECF No. 94. That framing risks treating two materially different defendants as a single sentencing unit, using a collective narrative that obscures the differences between them. It risks attributing Justin Cutright's aggravating conduct to Christin and allowing the sentence the government believes Justin deserves to flow downstream. Section 3553(a) requires a different inquiry.

Christin Curtright must be sentenced as Christin Curtright—not as an undifferentiated part of a married couple, not by association with her co-defendant, and not based on a generalized assessment of "the Curtrights" as a unit. The Fourth Circuit's decision in *United States v. Lymas* is instructive. In *Lymas*, the district court imposed the same sentence on co-defendants based on its view that all participants in the offense should receive the same punishment. 781 F.3d 106, 111, 113-14 (4th Cir. 2015). The Fourth Circuit vacated the sentences because the district court "essentially sentenced the crime itself rather than the individual defendants," failed to account for differences in the defendants' conduct and criminal histories, and adopted a "cookie-cutter approach that is the antithesis of our individualized sentencing process." *Id.* at 113-14. Section 3553(a)(6) permits consideration of unwarranted disparities, but only among defendants with similar records who have been found guilty of similar conduct. *Id.* at 112. It does not authorize parity for parity's sake where defendants' roles, personal histories, and culpability might differ.

10

The record shows that Justin Curtright was the driving force behind this crime. He pressed for the conduct, normalized it, and convinced Christin to participate. *See generally* Gov't Ex. 1-30, 34-44; *see also* Def. **Exhibit 2** (Justin Curtright admitted he "was the sole reason why his wife joined him and the victim. He convinced her knowing the victim was a minor."). Christin Curtright followed because her traumatic history and

made her acutely vulnerable to his pressure and control. As Dr. Hendricks explains in his evaluation report, her needs and desires were frequently thwarted by her husband, Justin:

> And yet, she persevered, because the alternative was to be alone and her experiences with abandonment created for her an ultimate fear and avoidance of being abandoned. Instead of taking the risk that asserting her own needs and desires might result in the loss of the relationship, she gave in to Justin's desires—including agreeing to drive to Virginia to pick up a girl she suspected was not of legal age. It is noteworthy that Ms. Curtright had never lived alone up to the time of her arrest. Given the number of times when she could have chosen to strike out on her own, this is a solid testament to her greatest fear: abandonment.

Def.'s **Exhibit 1**, at 13. Christin's childhood trauma left her with profound fear of abandonment, emotional dependency, and a desperate need to preserve attachment to the person she perceived as her sole source of safety and belonging—Justin Curtright. This was a situational and relationship-driven offense. It was not an offense born of Ms. Curtright's independent pursuit of a child victim, which differentiates her from her co-defendant and other defendants convicted of similar offenses.

Christin Curtright does not seek leniency because she was married to Justin Curtright. She asks only that she not receive punishment based on his leading role, his motives, or the government's collective characterization of the couple. The record distinguishes them in ways

that matter at sentencing: their differing roles, motives, psychological profiles, and risk factors. Because Christin and Justin are not similarly situated, § 3553(a)(6) does not require equivalent punishment. Instead, it supports individualized treatment.

### C. A 180-month sentence satisfies the need to protect the public and provide adequate deterrence.

The need to protect the public and afford adequate deterrence is serious in every case involving harm to a child. But those purposes must still be assessed based on the actual defendant before the Court. The question under § 3553(a)(2)(B) and (C) is not whether punishment is required (it is) but whether additional years beyond fifteen are necessary to protect the public from this particular defendant or deter future criminal conduct. The record does not support that conclusion.

Christin Curtright presents a low risk of sexual reoffending. Def.'s **Exhibit 1**, at 16. She simply does not have the same public-safety profile as a defendant whose record shows independent pursuit of child victims, repeated predatory conduct, or a persistent pattern of sexual offending. *See also id.* at 11 (noting

). Coordinated treatment, including pharmacotherapy and intense individual psychotherapy, is recommended to ensure she maintains a low level of risk. *Id.* at 16. Christin has been compliant with her current medication regimen, which keeps her stable, and is eager to engage in the "deeper work of psychotherapy to fully address her problems." *Id.* at 14; *see id.* (Christin "desires such treatment and would welcome guidance that may be provided by supervision á la probation"); *see also id.* at 6, 13 (Christin proactively expressed a desire to engage in psychotherapy before any questions about this were even asked). The need to

protect the public simply does not present in this case to the same extent it does with most child sex crimes.

That conclusion is consistent with the rest of the record. Christin has virtually no criminal history—her one criminal history point results from her theft of less than $100 worth of food from Walmart while pregnant, because she didn't have sufficient funds to pay for all of the items she needed. Def. **Exhibit 1**, at 6; Presentence Investigation Report (PSR), ECF No. 90, at ¶ 51. Additionally, she has no record of violence, no significant substance-abuse history, and no history of repeated criminal conduct. Def. **Exhibit 1**, at 6; PSR ¶¶ 52, 67.

Her conduct in custody further reinforces this assessment. Christin has used her time in custody productively, completing 993 course hours and earning hundreds of certificates across various educational, vocational, and rehabilitative subjects. Def. **Exhibit 3**; Def. **Exhibit 4**. Those efforts show discipline, compliance, and a genuine willingness to engage in the work necessary to reduce risk and prepare for lawful reentry. *See also* Def. **Exhibit 1**, at 12-13 (Christin "hopes to be able to attend college courses, either while incarcerated or out on probation, that will help her to improve her ability to find employment that she enjoys and allows her to contribute to the community in a positive way"). It is also notable that despite her childhood trauma, Christin has worked to repair her relationship with her mother and enjoys her mother's full support as she stands before the court for sentencing. Def. **Exhibit 5**.

A 180-month sentence will restrict Christin's liberty for a significant period of time and provide both specific and general deterrence. The record does not show that additional years of imprisonment would meaningfully increase public safety or deterrence. Given Christin's

low assessed risk, minimal criminal history, lack of substance-abuse history, and productive institutional conduct, 180 months is sufficient to satisfy § 3553(a)(2)(B) and (C).

### D. Fifteen years in federal prison is a severe punishment that satisfies the purposes of sentencing.

Fifteen years in federal prison is not leniency. It is a severe punishment that will separate Ms. Curtright from her young son for the remainder of his childhood. It will deprive her of liberty for a significant part of her adult life. It will mark her permanently with two serious felony convictions, both sex offenses. It communicates, unmistakably, that harm to a child carries serious consequences.

A longer sentence would add punishment, but the record does not show that it would materially advance any statutory purpose. It would not make Christin Curtright less likely to reoffend than the already lengthy mandatory minimum sentence and supervised release will accomplish. It would not better account for her subordinate role, trauma history, low assessed risk, and demonstrated capacity for rehabilitation. It would simply add years to a sentence that is already severe. *See United States v. Faison*, No.GJH-19-27, 2020 WL 815699, at \*1 (D. Md. Feb. 18, 2020) ("[I]t is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.").

The parsimony principle matters most in cases like this one, where the offense is serious, but the defendant's individual culpability, risk, and history distinguish her from the advisory range. A sentence of 180 months is sufficient, but not greater than necessary.

14

Respectfully submitted,


*/s/ Kristin B. Johnson*
Kristin B. Johnson (VSB No. 71115)
Woods Rogers Vandeventer Black PLC
10 South Jefferson Street, Suite 1800
Roanoke, Virginia 24011
Telephone: (540) 983-7600
Facsimile: (540) 983-7711
kristin.johnson@woodsrogers.com

*Counsel for Christin Curtright*


## CERTIFICATE OF SERVICE

I certify that the foregoing was filed via ECF on June 8, 2026, which will provide notification to all counsel of record.


*/s/ Kristin B. Johnson*
Kristin B. Johnson

15